Kevin L. BENSON, Respondent,

v.

IOWA BEEF PROCESSORS, Relator,

Commissioner of Economic Security, Respondent.

No. C9–84–54.

Court of Appeals of Minnesota.

May 29, 1984.

Barbara J. Runchey, Runchey, Louwagie & Wellman, Marshall, for respondent.

Douglas P. Seaton, Popham, Haik, Schnobrich, Kaufman & Doty, Ltd., Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., Regina M. Chu, Sp. Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by WOZNIAK, P.J., and HUSPENI and NIERENGARTEN, JJ., with oral argument waived.

## OPINION

WOZNIAK, Judge.

After being fired, Kevin Benson filed for unemployment benefits. A claims deputy allowed benefits, but was overruled by an appeal referee who found Benson guilty of

misconduct. Benson then appealed to the Commissioner, who reversed the referee's decision because the employer had not sustained its burden of showing misconduct. We affirm.

## FACTS

Benson was employed by Iowa Beef Processors as a high trimmer. His usual duties consisted of trimming the upper portion of cattle carcasses. When he worked the early shift, Benson would start at 5:30 a.m. and leave at 2:30 p.m. Typically, the work would be completed around 2:00 and the workers would spend some time cleaning up. The amount of time spent cleaning up varied from person to person. On May 2, 1983, a supervisor assigned Benson to a head-splitting crew.

The head-splitting crew consists of five members. The cattle head is processed first by two "cheekers." The next operation is done by a worker using a "wizard" knife. Benson would then remove temple meat from the jawbones,[1] and split the skull to salvage the brain lobes. Unsalvageable portions are shoved down an auger hole and taken by conveyor belt to a different section of the plant. Salvageable portions are given to the final worker in the line who "bags brains."

Two kinds of heads were processed: "knocked" and "koshered." A knocked head was from a steer stunned to death by a blow to the head. Part or all of the brain in a knocked head is unsalvageable because of bone chips and blood clots. A koshered head is from cattle killed by slitting its throat. No damage to the brain results.

Since Benson did not know how to use a wizard knife or do other tasks in the process, he split the heads. He had split heads before, but only occasionally. The last time had been nearly a year before. When he had previously done the operation, the brains from knocked heads were not saved while the brains from koshered heads were saved. The policy, however, changed: the

head splitters were supposed to look for any salvageable portion of the brain in knocked heads. Benson was never instructed on the change of procedure. Instead, Benson relied on the instructions of his fellow employees. They told him the brains from the knocked heads were not salvaged. Toward the end of his shift, Benson failed to split several of the knocked heads since the brain bagger was not saving the brains anyway.

At the end of the early shift, on the day after Benson had started splitting heads, a supervisor found several unsplit cattle heads. Testimony conflicted as to whether the unsplit heads were koshered or knocked. Sufficient evidence is on the record, however, to support the inference that the heads were koshered. The supervisor went to talk to Benson, but he had already left. Checking the timecards showed that Benson had left at 2:26, the first cheeker at 2:28, the second cheeker and the wizard knife operator at 2:27. The next morning, May 4, 1983, Benson was terminated.

## ISSUES

1. Was Benson guilty of misconduct for leaving early from work?

2. Was Benson guilty of misconduct for not splitting "knocked" cattle heads and salvaging the brains?

## ANALYSIS

■■■ An employee is disqualified from receiving unemployment benefits if discharged for misconduct. Minn.Stat. § 268.-09(1) (1982). Misconduct is a willful disregard for standards of behavior which an employer has a right to expect of his employee. *Auger v. Gillette Co.*, 303 N.W.2d 255 (Minn.1981). Willful disregard does not include inability, negligence, or good faith errors of judgment or discretion. *Tilseth v. Midwest Lumber Co.*, 295 Minn. 372, 375, 204 N.W.2d 644, 646 (1973);

---

**1.** Although the record is not entirely clear on this point, apparently the jawbones are split from the skull and handled separately.

*Group Health Plan, Inc. v. Lopez,* 341 N.W.2d 294, 297 (Minn.Ct.App.1983).

 Looking at the findings in the light most favorable to the commissioner's representative's decision, *White v. Metropolitan Medical Center,* 332 N.W.2d 25 (Minn.1983), we have an employee who was filling in at a job not regularly his own. Although he had done the job before, it had been a while and the procedure had been changed. No supervisor gave him instructions, so he relied on his fellow employee's instructions. After finishing his work and cleaning up, he left and punched out a minute before his fellow workers. Upon finding irregularities in the employee's work, the employer fired the employee.

Punching out a minute or two before his fellow workers does not show that Benson left his position early. Apparently, the work is usually done some time around 2:00 and people vary in the amount of time it takes them to clean up. Even a line at the time clock at the end of the shift could account for such an insignificant difference in punchout times.

An employer does not have the right to expect an employee to take over an unfamiliar position without any instruction and perfectly comply with the procedures. Even if Benson should have known that some changes had taken place, failing to go to a supervisor and relying on his fellow worker's instructions is at most a good faith error of judgment.

### DECISION

The commissioner's representative properly found that Benson had not left his station early and that his failure to split several cattle heads was not misconduct.

Affirmed.